UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TRAVELL THOMAS,<br><br>      Movant,<br><br>   -v.-<br><br>UNITED STATES OF AMERICA,<br><br>      Respondent. | 18 Civ. 2772 (KPF)<br>15 Cr. 667-5 (KPF)<br><br>**OPINION AND ORDER** |

KATHERINE POLK FAILLA, District Judge[1]:

  Travell Thomas brings this motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. In November 2016, Thomas pleaded guilty to one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, and one count of wire fraud, in violation of 18 U.S.C. § 1343. This Court sentenced Thomas principally to concurrent terms of 100 months' imprisonment. In his § 2255 motion, Thomas argues that his prior attorney, Scott Riordan,[2] rendered ineffective assistance during Thomas's prosecution by failing: (i) to challenge the Government's characterization of Thomas as a "debt collector"; (ii) to negotiate a suitable plea agreement; and (iii) to challenge the Government's standing and the Court's subject matter jurisdiction over his prosecution. Because Thomas has failed to show that his attorney provided

---

[1]  The Clerk of Court is directed to modify the caption as shown above.

[2]  Thomas's motion papers refer only to the legal assistance he received from Scott Riordan. However, as explained below, Thomas's legal team consisted of Riordan along with three other attorneys. The Court's analysis of Thomas's § 2255 motion would not be altered were it to interpret the motion as alleging that all four attorneys provided ineffective assistance.

ineffective assistance of counsel that prejudiced him in any way, his § 2255

motion is denied.

**BACKGROUND**[3]

**A.    Factual Background**

From at least 2010 until February 2015, Thomas was a co-owner, Chief

Executive Officer, and President of the Buffalo-based debt collection company

Four Star Resolution ("Four Star"), as well as related entities.  (PSR ¶ 42).

Together with co-owner Maurice Sessum, Thomas was responsible for

managing Four Star's day-to-day operations, finances, bank accounts, hiring

and termination of employees, and solicitation of consumers to collect debts.

(*Id.*).

Specifically, Thomas oversaw four debt collection offices operated by

Four Star in Buffalo.  (PSR ¶ 43).  He managed a team of more than a dozen

managers, who in turn oversaw dozens of debt collectors.  (*Id.*).  As owner and

president of Four Star, Thomas drafted, approved, and disseminated collection

scripts that contained a variety of misrepresentations, and he instructed his

collectors to make those misrepresentations to consumers over the phone.  (*Id.*

at ¶ 44).  Thomas participated in regular management meetings in which he

discussed, edited, and approved scripts containing misrepresentations and

---

[3]    All docket entries in this Opinion refer to the docket for *United States* v. *Travell Thomas*,
No. 15 Cr. 667 (KPF).  For ease of reference, the Court refers to the parties' briefing as
follows: Thomas's memorandum supporting his motion is referred to as "Thomas Br."
(Dkt. #483); the Government's memorandum in opposition as "Gov't Opp." (Dkt. #505);
and Thomas's reply as "Thomas Reply" (Dkt. #520).  In addition, the Court refers to
Thomas's Presentence Investigation Report, which is maintained in a restricted format
at docket entry 363, as "PSR."

arranged for those scripts to be disseminated to collectors on the collection floor.  (*Id.*).

At Thomas's direction and under his supervision, Four Star debt collectors, using a variety of aliases, tricked and coerced thousands of victims throughout the United States into paying more than $31 million in consumer debts through a variety of false statements and false threats, including that: (i) Four Star was affiliated with local government and law enforcement agencies, including the "county" and the local district attorney's office; (ii) the consumers had committed criminal acts, such as "wire fraud" or "check fraud," and if they did not pay the debt immediately, warrants or other process would be issued, at which point they would be arrested or haled into court; (iii) the victims would have their driver's licenses suspended if they did not pay their debts immediately; (iv) Four Star was a law firm or mediation firm and Four Star employees were working with lawyers, a law firm, mediators, or arbitrators; and (v) a civil lawsuit would be filed, or was pending, against the victims for failing to pay their debts.  (PSR ¶ 49).

As an additional part of the scheme, Thomas routinely and falsely inflated the balances of debts owed by consumers in Four Star's software so that debt collectors could collect more money from the victims than the victims actually owed, a practice known within the company as "overbiffing" or "juicing" balances.  (PSR ¶ 50).  Thomas also arranged to place purported debts with several of Four Star's offices so that multiple collectors could solicit and coerce a particular victim to repay a debt more than once, a practice known as

3

"double collecting." (*Id.* at ¶ 52). Additionally, at times, Thomas manipulated the loan origination date in the collection software to reflect, falsely, that the debt was within the applicable statute of limitations, when in fact the debt was outside the statute of limitations. (*Id.* at ¶ 53).

During this time, Thomas and Sessum organized mailing campaigns that involved the dissemination of false and fraudulent mailers to consumers throughout the United States. (PSR ¶ 55). As Thomas and Sessum knew, the mailers included fake court documents and affidavits — purportedly sent on behalf of courts and government agencies — that falsely threatened the debtors that they would be sued, prosecuted, or otherwise haled into court if they did not repay their debts. (*Id.*). Thomas and Sessum together reviewed and approved the mailers and arranged for their dissemination by mail across the country. (*Id.*).

Thomas also organized training sessions in which collectors were trained on how to make misrepresentations over the phone to consumers. (PSR ¶ 56). At one of Four Star's collection centers, Thomas arranged for a manager to appear in person to train collectors on the debt collection technique known as "serving," in which collectors call consumers on the phone, pretending to be process servers, and threaten that the debtors will be served with civil or criminal process imminently if they do not repay the debt. (*Id.*). Thomas attended the training sessions. (*Id.*).

As but one indicator that Four Star was not being operated in a lawful or legitimate manner, Thomas regularly received complaints from the Better

Business Bureau, state attorneys general, the Consumer Financial Protection Bureau, and other state and federal law enforcement agencies, as well as lawsuits, regarding Four Star's abusive debt collection practices. (PSR ¶ 57). Thomas and others at Four Star disregarded these complaints and, at times, submitted false and misleading responses to agencies to avoid law enforcement scrutiny. (*Id.*).

Additionally, Thomas periodically changed Four Star's company name and contact information, and the names and contact information that collectors provided over the phone to consumers, in response to consumer complaints and law enforcement inquiries. (PSR ¶ 58). In November 2012, the payday loan company Advance America advised Thomas that Advance America had learned that Four Star employees were (i) making improper threats and misrepresentations in order to collect debts purportedly owed to Advance America and (ii) falsely indicating to consumers that Four Star was providing collection services on behalf of Advance America. (*Id.* at ¶ 59). Advance America issued a letter to Thomas directing Thomas to cease and desist using Advance America's name in collecting debt. (*Id.*). Thomas refused, and employees of Four Star continued to misrepresent to consumers that they were collecting debts on behalf of Advance America. (*Id.*).

On November 28, 2012, Thomas testified falsely under oath in a deposition conducted by the Office of the New York Attorney General regarding Profile Management and International Arbitration Services, two aliases used for Four Star. (PSR ¶ 60). Among other things, Thomas testified that Profile

Management ceased collecting debt at "the end of 2009" and "just processes payment for a company, remits the money to the company after they process the payments." (*Id.*). In fact, Thomas oversaw a debt collection office that operated continuously under the name Profile Management and other names until it was shut down in February 2015. (*Id.*).

In May 2015, following the commencement of a federal criminal investigation into the company, a former Four Star employee received a grand jury subpoena. (PSR ¶ 61). Thereafter, Thomas instructed this employee in a text message not to show company scripts "to anyone" because they "weren't legal." (*Id.*).

From 2010 through February 2015, Four Star received $31,475,156.96 from consumer victims through payment processors. (PSR ¶ 62). Four Star's corporate bank records show that, during this period, consumer payments were diverted to pay certain of Thomas's personal expenses. (*Id.* at ¶ 63).

## B.    Procedural Background

On October 27, 2015, the Government filed a two-count superseding indictment, S4 15 Cr. 667 (the "S4 Indictment") in the Southern District of New York. (Dkt. #14). Count One charged conspiracy to commit wire fraud; from at least 2010 through February 2015, in the Southern District of New York and elsewhere, Thomas, Sessum, and at least nine others conspired to make false and fraudulent representations by telephone and email to victims in order to convince those victims to pay purported debts, including by wire transfer. (*See* S4 Indictment; PSR ¶ 2). Count Two charged the substantive offense of wire

fraud; from at least 2010 through February 2015, in the Southern District of New York and elsewhere, Thomas, Sessum, and the same individuals charged in Count One engaged in a scheme to make false and fraudulent representations by telephone and email in order to convince victims to pay purported debts, including by wire transfer. (*See* S4 Indictment; PSR ¶ 3).

Thomas was arrested in the Western District of New York on the same day that the S4 Indictment was filed. (Dkt. #27). On November 6, 2015, Thomas and his co-defendants were arraigned on the S4 Indictment in the Southern District of New York. (Dkt. #86 (transcript)). At the arraignment, Thomas was represented by Scott Riordan, who, along with others, continued to represent him through the remainder of his criminal proceedings. (*See generally* Dkt.).

On November 20, 2015, Thomas filed a motion to transfer venue to the Western District of New York. (Dkt. #63). All of the other defendants joined in the motion. (*See* Dkt. #65, 67, 69, 70, 85, 89, 110, 111, 136). The Government opposed the motion in a brief filed on December 15, 2015. (Dkt. #79). The Court held oral argument on the motion on February 11, 2016. (Dkt. #546 (transcript)). On February 25, 2016, the Court denied the motion to transfer venue. (*See* Dkt. #136).

On June 17, 2016, the Court set a schedule for the filing of any pretrial motions. (Dkt. #188, 189). On July 15, 2016, Thomas filed an omnibus brief seeking a bill of particulars, discovery on the issue of selective prosecution, disclosure of *Brady* material, the production of *Giglio* material, early disclosure

of Jencks Act material, and the identity of informants, as well as moving to strike language from the indictment, to dismiss the indictment, to controvert the search warrants, to suppress evidence seized pursuant to email search warrants, and to suppress the contents of Four Star's computers. (*See* Dkt. #202). Thomas also joined in the motions of his co-defendants. (*See id.*). On August 5, 2016, the Government filed a brief opposing all forms of relief sought by Thomas. (*See* Dkt. #226). The Court held oral argument on the motions on August 22, 2016 (*see* Dkt. #284 (transcript)), and then denied the motions (*see* Dkt. #238). That same day, attorney Marvin Schechter, entered a notice of appearance on the record for Thomas. (Dkt. #237). By October 6, 2016, Thomas had also added attorney Inga Parsons to his defense team. (*See* Minute Entry for 10/6/2016).

On November 1, 2016, Thomas appeared before the Court for a change of plea hearing. (*See* Transcript of Plea Proceedings of 11/1/2016 (Dkt. #326 ("Plea Tr."))). At his plea hearing, Thomas was represented by both Inga Parsons and Marvin Schechter. (*See id.* at 2). The Court confirmed that Thomas was pleading guilty pursuant to a written plea agreement with the Government (the "Plea Agreement"). (*See id.* at 23:22-25:14). At his plea hearing, the Court found that Thomas was competent to plead guilty. (*Id.* at 7:10-16). It confirmed that Thomas had reviewed the S4 Indictment (*id.* at 7:17-24); discussed the charges (and any defenses he had to them) with his attorneys (*id.* at 7:25-8:4); discussed with his attorneys the consequences of entering a guilty plea (*id.* at 8:5-7); and was satisfied with his attorneys'

representation of him (*id.* at 8:8-10).  The Court then reviewed with Thomas the rights he would give up by pleading guilty.  (*See id.* at 8:11-14:10).  Thomas took several minutes to discuss with his lawyers the Court's advice to him that if he pleaded guilty, he would be giving up his right to challenge the Court's ruling on his pretrial motions.  (*See id.* at 14:11-15:14).

The Court ensured that Thomas understood the elements of wire fraud and conspiracy to commit wire fraud.  (Plea Tr. 16:8-17:18).  Then, the Court explained the maximum possible penalties as followed:

> What I'd like to do now, sir, is talk to you about the maximum possible penalties that are associated with each of these offenses, and I use the term "maximum" deliberately, sir.  I mean to suggest the most that could possibly be imposed.  I'm not suggesting that this is necessarily what you're going to receive, but I want to make sure you understand, sir, that by pleading guilty you are exposing yourself to the possibility of receiving any combination of punishments up to the statutory maximum terms that I'm about to describe.

(*Id.* at 17:19-18:3).  The Court confirmed that Thomas understood this; that the "maximum term of imprisonment for each of these offenses, the conspiracy offense and the substantive wire fraud offense, is 20 years' imprisonment" and that "the maximum aggregate term here is [4]0 years' imprisonment." (*Id.* at 18:5-13).[4]

The Court also ensured that Thomas had discussed the United States Sentencing Guidelines (the "Guidelines") with his attorneys and that he

---

[4]    The transcript reflects that the Court stated "30" years, but the Court is confident that it said "40" and that this is merely a transcription error.

understood his sentence would ultimately be up to the Court. (Plea Tr. 22:8-23:21). The Court then reviewed several provisions of the Plea Agreement with Thomas. (*See id.* at 23:22-25:8). The Court confirmed that Thomas had read and understood the Plea Agreement. (*Id.* at 25:7-8, 25:12-14). In the Plea Agreement, Thomas and the Government stipulated to a Guidelines range of 151 to 188 months' imprisonment (the "Stipulated Guidelines Range"). (Plea Agreement 3). The parties further agreed that Thomas was waiving any right to appeal or collaterally attack a sentence within or below the Stipulated Guidelines Range, except to the extent the claims were based on ineffective assistance of counsel. (*Id.* at 4). When asked whether he had a sufficient opportunity to discuss the Plea Agreement with his attorneys, Thomas responded to the Court, "[y]es, I had ample time." (Plea Tr. 25:9-11).

Thomas then confirmed that he understood the Guidelines stipulations in the Plea Agreement and that the Court was not bound by the parties' stipulations. (Plea Tr. 27:9-28:4). Thomas also confirmed that he understood the appeal waiver. (*Id.* at 28:8-31:11). Thomas then allocuted to the conduct underlying his wire fraud charges:

> Between 2010 and 2015, I agreed with others to collect debts through a debt collection agency, which I owned, through the use of misrepresentations which I knew to be false, for the purpose of getting persons to pay the agency money. I was aware that among these misrepresentations that were used was telling people they would be served with a summons and asking people over the phone to pay amounts of money over and above what was actually owed by having persons at the debt collection agency increase the amount of money in phone calls, a practice known as juicing. I was aware of scripts that were prepared for use by

workers at the debt collection agency, which contained misrepresentations, the purpose of which was to get the individuals to pay money as a result of these misrepresentations.

These misrepresentations were accomplished by the use of telephones, text messages, social media, Facebook messenger, messaging services, emails, faxes, and wire transfers to banks. I knew that what I was doing was wrong and violated the law. When I committed these acts, I did so of my own free will.

(*Id.* at 33:10-34:3).

Thomas appeared before the Court for his sentencing on April 20, 2017, represented by Marvin Schechter, Inga Parsons, and Robert Scalione, the law partner of Scott Riordan. (*See* Transcript of Sentencing Proceedings of 4/20/2017 ("Sent. Tr." (Dkt. #387))).[5] At the sentencing, defense counsel stated that Thomas had no objections to the PSR, and the Court therefore adopted it. (*Id.* at 6:1-11).

The Court then discussed various sentencing issues with the parties. First, the Court asked the Government to explain why a Guidelines sentence would be appropriate given the fact that

for some of the debtor victims in this case, there was, in fact, an underlying debt. It may not have been the number that was represented to them and it may not have been something that would have subjected them to criminal liability, but I don't think these individuals were just picked out of the phone book or whatever the Google equivalent is. They owed money at some point, and so there is an argument that has been made, I want to explore it with you, that perhaps there is a degree to

---

[5]     Accordingly, by the time of his sentencing, Thomas was represented by a team of four lawyers. (*See* Sent. Tr. 14:13-18).

> which the loss figure is overstated because embedded
> within it is actual debt.

(Sent. Tr. 20:11-22). The Court then heard oral sentencing presentations from the Government, defense counsel, and Thomas. (*Id.* at 20:24-56:4).

The Court calculated Thomas's Guidelines range to be 151 to 188 months, affording Thomas a three-level reduction in his offense level for acceptance of responsibility. (Sent. Tr. 57:16-58:5). The Court then imposed concurrent sentences of 100 months on each of Counts One and Two. (*Id.* at 58:13-14). In varying downwardly from the Guidelines range, the Court cited Thomas's ties to his family and community, the struggles he had endured as a father, and the fact that "there was in these cases an underlying debt." (*Id.* at 58:17-59:18). The Court also reasoned as follows:

> Thinking about all the 3553(a) factors, I am impressed
> most by the offense conduct. It is aberrant in the sense
> it is at odds with much of what Mr. Thomas has done
> with his life, but it is galling by any metric, whether I
> use the number of victims, the egregiousness of the
> statements made, the number of individuals involved in
> the conspiracy, by any metric this is an extraordinarily
> bad scheme and it [wreaked] havoc on the lives of
> people. As noted, there were chances not to engage in
> it or to stop, but instead even after civil authorities were
> involved, he continued for three years.

(*Id.* at 60:19-61:3).

The written judgment was entered on April 21, 2017. (Dkt. #373). On May 2, 2017, Thomas filed a notice of appeal with the United States Court of Appeals for the Second Circuit. (Dkt. #384). On May 11, 2017, Inga Parsons, Marvin Schechter, Scott Riordan, and Robert Scalione moved the Second Circuit to be relieved as counsel, since Thomas had pleaded guilty and had

been sentenced pursuant to a Plea Agreement in which he had waived his right to appeal if he received a sentence below the Guidelines except to challenge the effectiveness of counsel. (*United States* v. *Thomas*, No. 17-1474, Dkt. #20 (2d Cir. May 11, 2017); *id.* at Dkt. #27).

On June 8, 2017, the Second Circuit granted Thomas's attorneys' motion and stated as follows:

> Within 30 days of the date of this order, replacement counsel must file a notice of appearance on behalf of Appellant or the Court will presume Appellant is proceeding *pro se*. It is further ORDERED that the appeal will be dismissed effective July 10, 2017 unless Appellant either pays the docketing fee or moves for leave to proceed *in forma pauperis*.

(Dkt. #405).[6] On July 12, 2017, the Second Circuit dismissed Thomas's appeal for failure to pay the filing fee. (*United States* v. *Thomas*, No. 17-1474, Dkt. #36 (2d Cir. July 12, 2017)).

On March 23, 2018, Thomas, *pro se*, filed a motion pursuant to 28 U.S.C. § 2255 to vacate his conviction on the grounds that his prior attorney, Riordan, had been ineffective. (Dkt. #483). Thomas also filed a supporting affidavit. (*See* Dkt. #483 ("Thomas Aff.") at 14-15). On April 28, 2018, Thomas filed an attorney-client privilege waiver form. (Dkt. #486). On June 28, 2018, Riordan filed an affirmation in response to Thomas's motion charging him with ineffective assistance. (Dkt. #501 ("Riordan Aff.")). The Government filed a brief in opposition to Thomas's motion on July 11, 2018. (Dkt. #505). On

---

[6]     The order addresses only Inga Parsons and Marvin Schechter because they were the only two of Thomas's attorneys who had entered a notice of appearance on the appellate docket. However, the motion was made on behalf of all four attorneys.

August 15, 2018, Thomas filed a submission in reply to the Government's opposition. (Dkt. #520). Thomas's reply submission consisted of a reply brief, (*id.* at 1-10), a motion for leave to expand the record (*id.* at 12-16), a motion for leave to request an evidentiary hearing (*id.* at 18-21), and a motion for leave to request discovery (*id.* at 23-26).

As noted, Thomas's Plea Agreement with the Government contained a waiver of his right to appeal or collaterally challenge any sentence of imprisonment within or below the Stipulated Guidelines Range. (Plea Agreement; Plea Tr. 26:6-16). There was, however, a carveout to that waiver for claims of ineffective assistance of counsel.

## DISCUSSION

**A.    Applicable Law**

**1.    Motions Under § 2255**

Because Thomas is a *pro se* movant, his submission has been evaluated using "less stringent standards than formal pleadings drafted by lawyers." *Ferran* v. *Town of Nassau*, 11 F.3d 21, 22 (2d Cir. 1993) (internal citation omitted). The Court has construed Thomas's submissions "liberally and interpret[ed] them to raise the strongest arguments that they suggest." *McPherson* v. *Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (internal quotation marks and citation omitted).

A prisoner in federal custody may seek to have his sentence vacated, set aside, or corrected on the grounds that it "was imposed in violation of the Constitution or laws of the United States, or that the [trial] court was without

jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack[.]" 28 U.S.C. § 2255(a). However, the grounds for such a collateral attack under § 2255 are much more limited than those available on a direct appeal. *See United States* v. *Addonizio*, 442 U.S. 178, 185 (1979). Relief may lie "only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes 'a fundamental defect which inherently results in a complete miscarriage of justice.'" *United States* v. *Bokun,* 73 F.3d 8, 12 (2d Cir. 1995) (quoting *Hill* v. *United States*, 368 U.S. 424, 428 (1962)); *accord Cuoco* v. *United States*, 208 F.3d 27, 30 (2d Cir. 2000).

### 2. Developing the Record in § 2255 Motions

In ruling on a motion under 28 U.S.C. § 2255, the district court is required to hold a hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b); *see also, e.g., Pham* v. *United States*, 317 F.3d 178, 185 (2d Cir. 2003) (noting that 28 U.S.C. § 2255 does not permit summary dismissals of motions that present facially valid claims). That said, the filing of a § 2255 motion does not automatically entitle the movant to a hearing, as, for example, in instances in which a movant's allegations are "vague, conclusory, or palpably incredible." *Machibroda* v. *United States*, 368 U.S. 487, 495 (1962). Rather, it is within the district court's discretion to determine the scope and nature of a hearing. *Chang* v. *United States*, 250 F.3d 79, 85-86 (2d Cir. 2001) ("It was, therefore, within the district court's discretion to choose a middle road

15

that avoided the delay, the needless expenditure of judicial resources, the burden on trial counsel and the government, and perhaps the encouragement of other prisoners to make similar baseless claims that would have resulted from a full testimonial hearing."). It is also within the district court's discretion to determine whether to hold a hearing, or to elect to investigate facts outside the record without the personal presence of the movant. *See Machibroda*, 368 U.S. at 495; *see also, e.g., Chang*, 250 F.3d at 85-86 (finding that it was within the district court's discretion to rely on "a detailed affidavit from trial counsel" instead of conducting a full hearing).

To warrant a hearing, the movant "must set forth specific facts supported by competent evidence, raising detailed and controverted issues of fact that, if proved at a hearing, would entitle him to relief." *Gonzalez* v. *United States*, 722 F.3d 118, 131 (2d Cir. 2013). In this regard, "[t]he procedure for determining whether a hearing is necessary is in part analogous to … a summary judgment proceeding.… If material facts are in dispute, a hearing should usually be held, and relevant findings of facts made." *Puglisi* v. *United States*, 586 F.3d 209, 213 (2d Cir. 2009). A court need not, however, credit factual assertions contradicted by evidence in the record of the underlying proceeding. *Id.* at 213-14. Moreover, "when the judge who tried the underlying proceedings also presides over a § 2255 motion, a full-blown evidentiary hearing may not be necessary." *Raysor* v. *United States*, 647 F.3d 491, 494 (2d Cir. 2011) (citing *Puglisi*, 586 F.3d at 214-15).

In determining whether the assertions in a § 2255 motion warrant discovery or a hearing, the court must take into account admissions made by the defendant at his plea hearing, for "[s]olemn declarations in open court carry a strong presumption of verity." *Blackledge* v. *Allison*, 431 U.S. 63, 74 (1977). "The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible." *Id.*

Ultimately, if it "plainly appears" from the motion, exhibits, and record of prior proceedings that the habeas movant is not entitled to relief, "the judge must dismiss the motion." Rule 4(b), Rules Governing Section 2255 Proceedings.

### 3.    Ineffectiveness Claims on Collateral Review

One potential basis for relief under § 2255 occurs when a defendant has received the ineffective assistance of counsel. A defendant in criminal proceedings has a right under the Sixth Amendment to effective assistance from his attorney at all critical stages in the proceedings; this includes pretrial investigation, *see, e.g., Strickland* v. *Washington*, 466 U.S. 668, 690-91 (1984); entry of a guilty plea, *see, e.g., Hill* v. *Lockhart*, 474 U.S. 52, 58 (1985); and sentencing, *see, e.g., Glover* v. *United States*, 531 U.S. 198, 202-04 (2001).

In order to succeed on a claim of ineffective assistance of counsel, a movant must meet the two-pronged test established by *Strickland*, 466 U.S. at 687. *First*, the movant must show that his counsel's representation was deficient, falling below the objective standard of reasonableness. *See id.* at

687-88.  During this first step, the standard of review is highly deferential and includes "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id.* at 689.  The Second Circuit has made clear that an attorney does not provide ineffective assistance by failing to raise frivolous arguments, even where requested by a client.  *See, e.g., Weingarten* v. *United States*, 865 F.3d 48, 53 (2d Cir. 2017).

*Second*, the movant must establish that his counsel's errors resulted in actual prejudice.  *See Strickland*, 466 U.S. at 694.  A movant satisfies this second prong by proving that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.*  In the specific context of guilty pleas, the prejudice analysis "focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process.  In other words, in order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."  *Hill*, 474 U.S. at 59.

A court is not required to conduct a *Strickland* inquiry in any particular order.  *See Strickland*, 466 U.S. at 697.  If the defendant does not successfully establish either the performance prong *or* the prejudice prong, the entire claim fails, and the remaining, unaddressed step becomes moot.  *See id.*

## B.    Thomas's Prior Counsel Did Not Render Ineffective Assistance

At the outset, the Court makes several observations about Thomas's criminal case and § 2255 motion that are worth mentioning.  Throughout his

case, Thomas was represented by a team of four experienced and able criminal defense attorneys. Thomas's contentions in his motion papers, including his brief and affidavit, only refer to attorney Riordan. While Riordan may have been the attorney with whom Thomas had the greatest contact, the Court notes that it witnessed Thomas's representation by all four attorneys, at least three of whom — Riordan, Parsons, and Schechter — were involved in the plea process. Notably, the Government asserts that it was Schechter and Parsons who represented Thomas in plea negotiations with the Government, not Riordan. (Gov't Opp. 5). Further, while the Court was not privy to the plea negotiations between defense counsel and the Government, nor to all conversations between them, the Court personally witnessed Thomas receive excellent legal representation in all written submissions to the Court and in all appearances before the Court.

### 1.    The S4 Indictment Was Not Defective

Thomas first claims that the S4 Indictment was jurisdictionally defective because it erroneously classified Thomas as a "debt collector." (Thomas Br. 11-12). Thomas explains that he is not a "debt collector," but rather a "defaulted debt purchaser." (*See id.*). In this regard, he draws a distinction between a defaulted debt purchaser, who purchases debt from debt brokers and legitimately owns the debt he tries to collect on, and debt collectors who work to collect debts owed to others. (*See id.*). Thomas also cites *Henson* v. *Santander Consumer USA Inc.*, 137 S. Ct. 1718 (2017), in support of his argument regarding this distinction. (*See id.* at 8-14, 24-29).

In *Santander*, the Supreme Court considered the term "debt collector" in the Fair Debt Collection Practices Act (the "FDPCA"), 15 U.S.C. § 1692. The FDCPA defines the term "debt collector" as anyone who "regularly collects or attempts to collect … debts owed or due … another." 137 S. Ct. at 1721 (quoting 15 U.S.C. § 1692a(6)). In *Santander*, both sides agreed that the term included third-party debt collection agents, and that it did not include those who seek to collect for themselves on loans they originated. *Id.* The Court confronted the issue between these two poles, namely, whether someone who purchases a debt and then tries to collect it for himself is a "debt collector" within the meaning of the FDCPA. *Id.*

The Supreme Court phrased the question as follows: "Does the [FDCPA] treat the debt purchaser in that scenario more like the repo man or the loan originator?" 137 S. Ct. at 1721. It answered the question "with a careful examination of the statutory text," which "seem[ed] to focus [the Court's] attention on third party collection agents working for a debt owner — not on a debt owner seeking to collect debts for itself." *Id.* The Court reasoned as follows:

> [The] language [of the FDCPA does not] appear to suggest that [the Court] should care how a debt owner came to be a debt owner — whether the owner originated the debt or came by it only through a later purchase. All that matters is whether the target of the lawsuit regularly seeks to collect debts for its own account or does so for "another." And given that, it would seem like a debt purchaser … may indeed collect debts for its own account without triggering the statutory definition in dispute ….

*Id.* at 1721-22. Accordingly, to the extent that Thomas contends he did not fall within the definition of "debt collector" as defined in the FDCPA because he owned the debt he collected on, and was not collecting the debts for "another," he is correct.

Thomas's argument, however, seeks to expand on that definition. Thomas claims that because of *Santander*, he "falls into the vacuum left by Congress whereby there is no statutory law governing [his] practices of recovering debts owed to [him]." (Thomas Br. 10). He contends that "there exists no predicate statute to support criminal charges." (*Id.* at 12). Further, he explains that "[t]he distinction by the Supreme Court between 'debt collector' and 'defaulted debt purchaser' makes obvious that one cannot be defrauding someone [who is] paying him his money back." (*Id.* at 12). Thomas reasons that because he was the rightful owner of the debts he collected, he could not properly be convicted of wire fraud with respect to those debts. (*See id.*).

Thomas wraps this argument in the cloak of ineffective assistance of counsel by claiming that he repeatedly told his attorney that he had purchased the defaulted debts that he was recovering on, but that his attorney "fail[ed] to listen to this critical piece of evidence chang[ing] the entire dynamic of this case." (Thomas Br. 24). Thomas further explains:

> In this case counsel's failure to listen to Thomas and then perform the constitutionally acceptable pretrial investigation prejudiced Thomas by allowing him to be prosecuted under an indictment that is legally flawed. Also, it allowed Thomas to be prosecuted where the

> court lacked subject matter jurisdiction and forfeited
> Thomas' due process rights to fair notice and to make
> an informed and intelligent decision of what plea to
> enter.

(*Id.*).

Thomas misconstrues the implications of *Santander* and the requirements for a wire fraud prosecution. The wire fraud statute criminalizes "devis[ing] or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmit[ted] or cause[d] to be transmitted by means of wire … in interstate or foreign commerce[.]" 18 U.S.C. § 1343. Accordingly, the elements of a mail or wire fraud violation are: (i) a scheme to defraud; (ii) money or property as the object of the scheme; and (iii) use of the mails or wires to further the scheme. *Fountain* v. *United States*, 357 F.3d 250, 255 (2d Cir. 2004).

The S4 Indictment alleges that Thomas conspired to make, made, willfully caused others to make, and aided and abetted others in making material misrepresentations and omissions using interstate wires in order to induce individuals to repay debts. Thomas himself allocuted that he "agreed with others to collect debts through a debt collection agency … through the use of misrepresentations which [he] knew to be false, for the purpose of getting persons to pay [his] agency money." (Plea Tr. 33:10-34:3). Specifically, he admitted to making false claims to debtors about legal actions that would be taken against them and to overstating the amount of debt people owed. (*See*

*id*.).  The crux of the matter is that Thomas and his co-defendants lied to debtors, using interstate wires, to collect on the debts and to convince debtors to remit funds to Four Star, including by wire transfer.  That is all that is required for a wire fraud prosecution.  Whether Thomas owned the debts or not is irrelevant.  Riordan explained as much to Thomas, telling him that "even though the debts that he attempted to collect appeared to be legitimate debts, that it was the way his companies collected the debt that made the collection of these debts illegal."  (Riordan Aff. ¶ 8).

Thomas's further assertion that, because the Government did not prove a violation of a "predicate statute," his prosecution for wire fraud was jurisdictionally defective is also incorrect.  As explained above, a wire fraud conviction requires (i) a scheme to defraud; (ii) money or property as the object of the scheme; and (iii) use of interstate wires to further the scheme.  The Government is not required to prove that Thomas violated another statute, such as the Fair Debt Collection Practices Act, in order to convict Thomas of either wire fraud or conspiracy to commit wire fraud.

Accordingly, Thomas has not shown that his counsel was ineffective in failing to challenge the Government's description of Thomas as a "debt collector" or in failing to object to Thomas's prosecution under the wire fraud statute.  *See, e.g., Weingarten*, 865 F.3d at 53 (counsel is not ineffective in failing to raise frivolous arguments).

**2. Thomas's Plea Was Knowing and Voluntary**

Thomas's next argument is that his "[c]ounsel rendered ineffective assistance during the plea process which rendered the plea agreement not knowing and voluntary." (Thomas Br. 16). Thomas contends that "[t]he terms of [the] agreement, in and of itself, tells us that counsel was ineffective in advising Thomas to sign it." (*Id.* at 18). Specifically, Thomas points to the following provisions of his Plea Agreement and Riordan's advice as to each:

- *First*, the Plea Agreement states that the total maximum term of imprisonment for both counts is 40 years, but Riordan never told Thomas that under 18 U.S.C. § 3584, "[m]ultiple terms of imprisonment imposed at the same time run concurrently unless the court orders or the statute mandates that the terms are to run consecutively. Thus, the maximum sentence under the relevant statutes was 20 years, not the 40 years stated in the plea agreement which weighed heavily on his decision to accept it." (*Id.*).

- "*Second*, because the plea agreement did not bar the use of conduct in the indictment for the basis of an additional enhancement or subsequent prosecution, Riordan exposed Thomas for the potential to be blind-sided at any time for a sentence above the stipulated 151-188 or worse, a RICO charge which Thomas would have the burden of disproving." (*Id.*).

- *Third*, it was unreasonable for Riordan to advise Thomas to waive his rights to request a downward departure and his appeal rights. (*Id.* at 19).

- *Fourth*, counsel advised Thomas to sign the Plea Agreement which would allow the Government to recharge Thomas if, for any reason, his conviction or sentence was vacated. (*Id.* at 19-20).

- *Fifth*, the sentencing calculations in the Plea Agreement match up with the conduct alleged in the Indictment, with no *quid pro quo* whatsoever. (*Id.* at 19).

As a preliminary matter, Thomas is correct that a defendant is entitled to the effective assistance of counsel in connection with plea negotiations. *See Lafler* v. *Cooper*, 566 U.S. 156, 162-63 (2012); *Purdy* v. *United States*, 208 F.3d 41, 44-45 (2d Cir. 2000). In this regard, counsel must communicate to the defendant the terms of the plea offer and should usually inform the defendant of the strengths and weaknesses of the case against him, as well as the alternative sentences to which he will most likely be exposed. *Purdy*, 208 F.3d at 45; *see generally Missouri* v. *Frye*, 566 U.S. 134, 144-46 (2012) (stating that defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused); *Davis* v. *Greiner*, 428 F.3d 81, 88 (2d Cir. 2005) ("[C]ounsel has a professional obligation to adequately inform [his] client about the considerations that are relevant to [his] client's decision to accept or deny a plea bargain."); *Pham*, 317 F.3d at 182 (noting that defense attorneys have "a constitutional duty to give their clients professional advice on the crucial decision of whether to accept a plea offer from the government"). An attorney's failure to communicate a plea offer to his client, or to provide objectively reasonable advice about the decision to plead guilty, may amount to constitutionally deficient performance. *See, e.g.*, *Cullen* v. *United States*, 194 F.3d 401, 404 (2d Cir. 1999); *United States* v. *Gordon*, 156 F.3d 376, 380 (2d Cir. 1998); *Boria* v. *Keane*, 99 F.3d 492, 496-97 (2d Cir. 1996).

However, despite Thomas's contention, none of his arguments evidences any deficiencies on the part of counsel during plea negotiations. The Court

addresses each argument in turn. *First*, the Court notes that it conducted a detailed plea allocution that complied in all respects with Rule 11 of the Federal Rules of Criminal Procedure. At his plea hearing, Thomas acknowledged that he had discussed the Plea Agreement with his attorneys; that he fully understood the Agreement; and that he was freely choosing to plead guilty. The Court made explicit to Thomas that his maximum sentencing exposure for the two counts in the S4 Indictment was 40 years. His contention that his maximum sentencing exposure after trial could only be 20 years is flatly incorrect; the statute on which he relies disproves his argument. *See* 18 U.S.C. § 3584(a) ("Multiple terms of imprisonment imposed at the same time run concurrently *unless the court orders or the statute mandates that the terms are to run consecutively.*" (emphasis added)). Therefore, it was not ineffective for Thomas's counsel to correctly advise him that his maximum sentencing exposure for both counts of the S4 Indictment was a combined 40 years.[7]

The Court is easily able to dismiss Thomas's second, third, and fourth complaints about the Plea Agreement. Thomas complains about several provisions of the Plea Agreement, including that the Plea Agreement did not foreclose the possibility of his future prosecution for criminal tax violations;

---

[7]     In his affidavit, Thomas contends that Riordan did not properly advise him of the sentencing ramifications if he went to trial and told him that if he turned down the Plea Agreement and went to trial he would get at least 18.5 years. (Thomas Aff. ¶ 6). Riordan explains that "[n]one of this is true." (Riordan Aff. ¶ 11). Given what it observed during the plea hearing, the Court has every reason to believe that Thomas properly understood his sentencing exposure. The Court also observes that, absent the three-level reduction for acceptance of responsibility, Thomas's offense level would have been 37, which would have yielded a Guidelines imprisonment range of 210 to 262 months, or 17.5 to 21.83 years.

that the Plea Agreement permitted the Government or a future plaintiff to use the underlying conduct as a predicate act or as a basis for a sentencing enhancement in a subsequent prosecution; that Thomas waived his appeal rights for a sentence within or below the Guidelines range; that the Plea Agreement did not permit Thomas to request a downward departure from the Stipulated Guidelines Range; and that the Government would be permitted to recharge Thomas if his conviction was vacated. (*See* Thomas Br. 18-20).[8] These are standard provisions that are contained in the vast majority of plea agreements that the Court sees. Given their prevalence in SDNY plea agreements — and their inclusion in the plea agreement of every co-defendant who pleaded guilty in this case — it is impossible to believe that the Government would have offered Thomas a plea agreement without such provisions. Accordingly, there is nothing about these boilerplate provisions of the Plea Agreement that causes the Court any concern regarding the representation he received throughout the plea process.

Further, the Court is not moved by Thomas's argument that he would not have pleaded guilty if counsel had told him if he proceeded to trial he would maintain his rights to appeal and seek a variance from the Court. (Thomas Br. 22). Riordan's affidavit states that the "plea agreement was discussed at length with the Defendant, as well as the possible sentence, among his four

---

[8]     The Court notes, in passing, that the first two of these complaints presuppose additional criminal convictions by Thomas.

attorneys." (Riordan Aff. ¶ 11). Indeed, at his plea hearing the Court confirmed that Thomas understood the appellate waiver. (Plea Tr. 28:8-29:5).

*Fifth*, Thomas argues that he did not receive a "quid pro quo" in exchange for his agreement to plead guilty. Thomas ignores the fact that the Plea Agreement stated that:

> Assuming the defendant clearly demonstrates acceptance of responsibility to the satisfaction of the Government, through his allocution and subsequent conduct prior to the imposition of sentence, a 2-level reduction will be warranted, pursuant to U.S.S.G. 3E1.1(a). Furthermore, assuming the defendant has accepted responsibility as described in the previous sentence, an additional 1-level reduction is warranted, pursuant to U.S.S.G. 3E1.1(b), because the defendant will have given timely notice of his intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

(Plea Agreement 3). Accordingly, despite Thomas's contention, he *did* receive a benefit in his Plea Agreement. The Government consented to a three-level acceptance of responsibility reduction in his offense level in exchange for his acceptance of responsibility and timely plea. Further, by pleading guilty pursuant to the Plea Agreement, Thomas locked the Government into the Stipulated Guidelines Range, which could have been raised had Thomas gone to trial. And by executing the Plea Agreement, Thomas was able to be sentenced on a cold record, without a lengthy trial record replete with numerous victims.

Riordan's affidavit states that he made many attempts to negotiate a lesser sentence, but that the Government would not agree. (Riordan Aff. 9).

Counsel believed there would most likely be a conviction after trial and for that reason, advised Thomas that accepting responsibility would have a beneficial impact on any sentence that was imposed. (*Id.* at 7). The Plea Agreement also permitted for Thomas's attorneys to argue for a sentence outside of the Stipulated Guidelines Range based upon the factors to be considered in imposing a sentence pursuant to 18 U.S.C. § 3553(a). Indeed, at his sentencing, Thomas's attorneys argued forcefully for a below-Guidelines sentence and because of their efforts, the Court sentenced Thomas substantially below the Guidelines range.

Accordingly, Thomas has not shown that Riordan provided ineffective assistance of counsel in the plea negotiation process or in advising Thomas to plead guilty.

### 3. The Court Has Jurisdiction Over Thomas's Criminal Case

Thomas's last argument is that the Court did not have subject matter jurisdiction to adjudicate his case. (Thomas Br. 31). Thomas explains that the Court lacks subject matter jurisdiction if the plaintiff (here, the Government) fails to establish standing, and he cites the standard for standing set out in *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555 (1992). (*Id.* at 32). Thomas argues that the Government's charging instrument does not show an injury in fact because the persons it calls "victims" were not in fact victims because they suffered no loss. (*Id.* at 33). He also argues that the Government has not shown that the injury is "concrete and particularized" because it has shown no injury at all. (*Id.* at 33-34). Further, Thomas argues that since there was no

injury there can be no causation. (*Id.* at 34). Finally, Thomas contends that "the failure by the government in prong one to establish an 'actual injury' allows this domino to fall along with the others." (*Id.* at 35). Thomas claims that because the Government did not seek restitution in this case, there can be no redressability. (*Id.* at 35-36).

The Court can swiftly reject this argument. Thomas seeks to import the elements of Constitutional standing, which have been discussed at length in civil cases, into the context of a criminal prosecution. But these are not the elements that courts consider in assessing whether the Government has standing, or whether a court has jurisdiction over a criminal case. Courts have long recognized "the special status of criminal prosecutions in our system." *Linda R.S.* v. *Richard D.*, 410 U.S. 614, 619 (1973).

The Court's jurisdiction over this wire fraud prosecution stems from 18 U.S.C. § 3231, which states that "[t]he district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States." And the wire fraud statute was properly enacted as a valid extension of Congressional authority granted by the Commerce Clause, as wires are channels or instrumentalities of interstate commerce. *See United States* v. *Jinian*, 725 F.3d 954, 968 (9th Cir. 2013); *United States* v. *Hook*, 195 F.3d 299, 310 (7th Cir. 1999).

Further, the United States Attorney's Office for the Southern District of New York was a proper party to bring this suit on behalf of the United States. The Office of the United States Attorney was created by the Judiciary Act of

1789, which provided for the appointment "in each district of a meet person learned in the law to act as attorney for the United States … whose duty it shall be to prosecute in each district all delinquents for crimes and offenses, recognizable under the authority of the United States, and all civil actions in which the United States shall be concerned[.]" Judiciary Act of 1789, 1 Stat. 92. Today, as in 1789, the United States Attorney for each judicial district retains, among other responsibilities, the duty to "prosecute for all offenses against the United States." 28 U.S.C. § 547(1). Accordingly, the instant case was properly prosecuted by the Office of the United States Attorney for the Southern District of New York to redress injury to the United States caused by Thomas's criminal conduct occurring in this District. *See* Thomas R. Lee, *The Standing of Qui Tam Relators Under the False Claims Act,* 57 U. Chi. L. Rev. 543, 569 (Spring, 1990) ("The government certainly has standing in criminal cases[.]").

As a further point, several courts, in thorough and persuasive reasoning, have rejected the argument raised by Thomas that the elements of Constitutional standing articulated in civil cases need be proven in criminal cases. As one court aptly explained:

> [T]o the extent *pro se* defendant has requested and intends to request [the] services [of a paralegal or investigator] to aid him in presenting a motion to dismiss based on this court's Article III jurisdiction to hear the case and the United States Attorney for the Western District's "standing" to conduct the prosecution, the motion must be denied because it is based on indisputably meritless legal theory. Although *pro se* defendant has latched on to the notion that to have standing in an Article III civil controversy, the

party bringing the action must have a concrete stake in the litigation and have suffered an injury-in-fact, he fails to appreciate the distinctions to be drawn between a criminal case and a civil controversy. And while the broad language appearing in some of the more recent Supreme Court opinions expounding on the limitations of Article III standing would appear at first brush to be irreconcilable with the traditional mechanics employed in conducting criminal prosecutions, dogmatically drawing a corollary conclusion that federal criminal prosecution is outside the jurisdictional reach of Article III is tantamount to the "absurd." *See* Edward Hartnett, *The Standing of the United States: How Criminal Prosecutions Show that Standing Doctrine is Looking for Answers in all the Wrong Places*, 97 Mich. L. Rev. 2239 (1999) (to reason and conclude from the current status of the Court's Article III standing doctrine that "the vast majority of federal criminal prosecutions are not 'cases' or 'controversies' and the United States lacks standing to initiate them [would,] … [o]f course, [amount to] an absurd result."). Furthermore, while there are several approaches that might be employed to harmonize the seemingly inconsistent principles present in federal criminal prosecutions with the Court's current approach to defining the outer scope of private causes of action challenging the actions of government officials under Article III, we need not delve into that foray to discard the notion that defendant may not be prosecuted by the Justice Department for violation of federal law on the junk pile of needless intellectual exercises in futility. *See id.* (noting that "Article III cannot sensibly be read to prohibit the United States from vindicating its sovereign interests in its own courts" and summarizing the various scholarly approaches that have been used to reconcile federal criminal prosecutions with the Court's current standing jurisprudence).

*United States* v. *Ellis*, No. 06 Cr. 390 (DSC), 2007 WL 2028908, at *1 (W.D. Pa. July 12, 2007).

Another district rejected an argument identical to Thomas's. While the analysis is lengthy, it merits inclusion in this Opinion:

[I]t is the United States' interest — the people's injury at large — that supports criminal standing.  But that just begs a most interesting question: after all, why *does* the United States have standing to bring a criminal action when the same generalized interest in enforcing the law does not support standing for private parties, *see, e.g., Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 575, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)?

As it turns out, Rice has touched on a well-known (seemingly apparent) tension between criminal prosecution and standing doctrine.  Indeed, legal academics attacking that doctrine have actually posed the exact same question about criminal standing as that raised by Rice.  *See, e.g.,* Edward A. Hartnett, *The Standing of the United States: How Criminal Prosecutions Show That Standing Doctrine Is Looking for Answers in All the Wrong Places*, 97 Mich. L. Rev. 2239, 2246 (1999)  ("What is the 'concrete and particularized' injury in fact suffered by the United States that gives it standing to bring a criminal prosecution?").  Unlike Rice, however, these scholars mean not to question the United States' standing in criminal cases, but to rely on that standing to disprove Rice's assumption: precisely because the government unquestionably has criminal standing, they say, particularized injury cannot possibly be required by Article III.  Since criminal actions only involve the public's generalized interest in enforcing the law, the argument goes, individualized injury must not be constitutionally required to create a "case or controversy."  *Id.* at 2246-51.

This attack on standing doctrine and Rice's challenge to his sentencing court's jurisdiction both fail for the same reason: the constitutional requirements of standing are "party-specific."  Ann Woolhandler & Caleb Nelson, *Does History Defeat Standing Doctrine?*, 102 Mich. L. Rev. 689, 695 (2004).  While individualized injury is necessary for private plaintiffs to have standing in private litigation, "diffuse injuries to the general public" are enough to create standing between the public (the government) and criminal defendants.  *Id.*; *see also* Thomas R. Lee, *The Standing of Qui Tam Relators Under the False Claims Act*, 57 U. Chi. L. Rev. 543, 570 (1990) ("The government enjoys ... a special constitutional status as plaintiff — it sues, for example, to enforce the

criminal laws, and it need not show a particularized injury as a predicate to sue."). The Supreme Court put the point quite clearly over a century ago, disavowing that the government needed a concrete interest to establish its standing to sue on behalf of the public:

> Every government, [e]ntrusted by the very terms of its being with powers and duties to be exercised and discharged for the general welfare, has a right to apply to its own courts for any proper assistance in the exercise of the one and the discharge of the other, and it is no sufficient answer to its appeal to one of those courts that it has no pecuniary interest in the matter. The obligations which it is under to promote the interest of all and to prevent the wrongdoing of one, resulting in injury to the general welfare, is often of itself sufficient to give it a standing in court.

*In re Debs*, 158 U.S. 564, 584, 15 S. Ct. 900, 39 L. Ed. 1092 (1895) (emphasis added) *disapproved of on other grounds by Bloom* v. *State of Ill.*, 391 U.S. 194, 195-96, 88 S. Ct. 1477, 20 L. Ed. 2d 522 (1968); *see also Alfred L. Snapp & Son, Inc.* v. *Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601, 102 S. Ct. 3260, 73 L. Ed. 2d 995 (1982) (recognizing the sovereign's interest in "creat[ing] and enforce[ing] a legal code, both civil and criminal"). It thus made perfect sense for Chief Justice John Marshall in *Cohens* v. *Virginia* to refer to an action by a state to enforce its penal laws as a "case." 19 U.S. (6 Wheat.) 264, 399, 5 L. Ed. 257 (1821); *see also* John Harrison, *The Power of Congress to Limit the Jurisdiction of Federal Courts and the Text of Article III*, 64 U. Chi. L. Rev. 203, 210 (1997) ("Cases include all legal actions, criminal and civil, while controversies include only civil proceedings."). The key to understanding standing doctrine thus lies in the oft-forgotten distinction between public and private rights.

So while there is no doubt whatsoever that the United States had standing to pursue a criminal action against Rice — and therefore, that the district court had jurisdiction in his case — that universally accepted conclusion is hardly inconsistent with the

> constitutional requirement of a concrete, individualized
> interest in private litigation. Standing is no more than
> the litigable interest necessary to create a case, and
> when it comes to the government, wrongs to the public
> at large — generalized grievances — will do. And that
> makes perfect sense, since the government represents
> us all. It is thus entirely natural that the United States,
> but no one individually, can vindicate the people's
> general interest in respect for the law. *Cf.* Lillian BeVier
> & John Harrison, *The State Action Principle and Its
> Critics*, 96 Va. L. Rev. 1767, 1785 (2010) ("[P]rivate
> individuals are principals, entitled to act to pursue their
> own interests, whereas government decisionmakers are
> agents, whose function is to further the interests of the
> citizens.").

*Rice* v. *Farley*, No. 14 Civ. 31 (ART), 2014 WL 2441260, at *2-3 (E.D. Ky.

May 30, 2014)

The Court agrees with the reasoning of these two cases and a host of

others that have concluded similarly. *See also Amezquita* v. *United States*,

No. 19 Civ. 1856 (CCC), 2019 U.S. Dist. LEXIS 160219, at *2 (D.P.R. Sept. 13,

2019) (concluding that United States had Article III standing to prosecute the

petitioner); *United States* v. *Rinaldi*, Nos. 3:18 Cr. 279, 3:18 Cr. 280 (RDM),

2019 U.S. Dist. LEXIS 217581, at *4-11 (M.D. Pa. Dec. 18, 2019) (relying on

*Ellis* to deny the defendant's motion to dismiss the indictment on the grounds

that the prosecution did not present a case or controversy before the court and

that the United States lacked standing to bring the prosecution); *United States*

v. *Hakim*, No. 1:18 Cr. 126 (MLB) (AJB), 2018 WL 6184796, at *9 (N.D. Ga.

Aug. 22, 2018) ("In any event, the Government has standing to prosecute this

action."); *United States* v. *Girod*, No. 5:15 Cr. 87 (DCR), 2016 U.S. Dist. LEXIS

82365, at *6-7 (E.D. Ky. June 24, 2016) ("Girod claims that there can be no

standing because there are no victims of his conduct.  However, the defendant

incorrectly assumes that the victims must be identified.  Further, diffuse

injuries to the general public and potential injuries are sufficient to create

standing for criminal prosecution." (internal quotation marks and citations

omitted); *United States* v. *Owens*, No. 5:13 Cr. 123 (KKC), 2014 WL 2600082,

at *1 (E.D. Ky. June 10, 2014) ("To the extent that Owens is arguing that the

government has no standing to prosecute him because the government has not

been injured by the acts alleged in the indictment, 'the Government doubtlessly

suffers an 'injury in fact' when a defendant violates its criminal laws.'" (quoting

*United States* v. *Yarbrough*, 452 F. App'x 186, 189 (3d Cir. 2011) (unpublished

opinion)); *Sierra Club* v. *Two Elk Generation Partners, L.P.*, 646 F.3d 1258, 1277

n.8 (10th Cir. 2011) ("When the federal government or one of its agencies

brings suit, its standing is usually based on its power, defined by Congress, to

redress violations of the laws of the United States.  This may be in tension with

courts' current understanding of Article III standing, but it is nonetheless

axiomatic."); *United States* v. *Ulloa*, No. 1:10 Cr. 321 (TJM), 2011 WL

13128610, at *5 (N.D.N.Y. May 13, 2011) ("Defendant's challenges to the

authority of the Court, and the standing and authority of the United States

Attorney's Office for the Northern District of New York to prosecute the case,

are frivolous."); *United States* v. *Daniels*, 48 F. App'x 409, 417-18 (3d Cir. 2002)

(unpublished opinion) ("Appellant finally argues that the United States lacks

standing to bring a criminal action against him in federal court because the

indictment fails to present a 'case' or 'controversy' as required by Article III,

Section 2 of the Constitution.... This contention is frivolous. As sovereign, the United States has standing to prosecute violations of valid criminal statutes."). Accordingly, the Court rejects Thomas's argument that the Government lacked standing to prosecute him for wire fraud.

## CONCLUSION

Thomas's motion under 28 U.S.C. § 2255 is DENIED. Because it is plain from Thomas's papers that he is not entitled to relief under § 2255, his motions for discovery, for an evidentiary hearing, and to expand the record are denied.

A certificate of appealability shall be not granted, because Thomas has not made a substantial showing of a denial of a federal right and appellate review is, therefore, not warranted. *Hoffler* v. *Bezio*, 726 F.3d 144, 154 (2d Cir. 2013); *Tankleff* v. *Senkowski,* 135 F.3d 235, 241 (2d Cir. 1998).

The Clerk of Court is directed to file this Opinion and Order in case numbers 18 Civ. 2772 and 15 Cr. 667. The Clerk of Court is further directed to terminate all pending motions, adjourn all remaining dates and close this case.

SO ORDERED.

Dated:     March 16, 2020
           New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

*Sent by First Class Mail to:*
Travell Thomas
Reg. No. 24449-0551
Federal Prison Camp
P.O. Box 2000
Lewisburg, PA 17837